SUPREME COURT.    Albany General Term, May, 1852    *Harris*,
                    *Parker* and *Wright*, Justices.

THE PEOPLE *vs.* CHARLES QUIN.

In charging a jury, an expression of opinion by the judge as to the effect of
the evidence, leaving the jury to decide the question notwithstanding such
expression does not furnish a valid ground of exception: *aliter*, if the lan-
guage, which is the subject of exception, amounts to an instruction as to the
law applicable to the evidence in the case

Where the question, on the trial, was whether the prisoner was guilty of
murder or manslaughter, and the presiding judge, in his charge to the jury,
after commenting on the evidence for the prosecution, said, "Now, gentlemen,
if you believe this evidence, and believe that the crime was committed by the
defendant, under the circumstances as given to you by these witnesses, I see
no ground to warrant you in finding the defendant guilty of manslaughter,
but in my judgment he is then guilty of murder," it was held to amount to
an instruction upon a conclusion of law: and the case properly presenting
questions of fact to be passed upon by the jury, viz., whether the killing was
by "premeditated design to effect death," or in the "heat of passion," &c.,
the charge was held to be erroneous and a new trial was awarded.

Indictment for the murder of Michael Gleason. The defend-
ant having pleaded not guilty, the trial was held at the Rens-
selaer Oyer and Terminer, in November, 1851, before Mr. Jus-
tice Watson and his associates. The alleged crime was com-
mitted at the house of Harry Thompson, in the city of Troy, on
the night of the 9th of January, 1851. There was a dance
there that night, at which Gleason and the defendant were
present. During the evening they had a dispute in relation to
a tobacco box, which the defendant alleged he had lost.

*Michael McDermott*, a witness for the prosecution, testified
that Gleason asked the defendant if he said he had stolen his
tobacco box; that defendant said no; he did not know that he
had taken it in particular, but he had lost it in the house, and
still he might be mistaken and have left it home in his over-
coat pocket; that Gleason said if he told him he took it he
would go out doors and fight him for it; that defendant said he
would not do it, as Gleason was too big a man for him, and then
somebody interfered. This took place in the dancing room,

and soon after one Cushing asked Gleason to go with him to the bar in an adjoining room and drink with him.  *McDermott* further testified, that they had been in the bar room two or three minutes, when defendant told him he was going to get a slice of lemon; that soon after he heard a scuffle in the bar room and then saw the defendant and Gleason come into the dancing room; Gleason shoved in the defendant; that Gleason had his arms around him and shoved him to about the middle of the floor and then fell, Gleason on the top; that they lay there a short time and were then separated.  About the time they fell some one remarked that defendant had a knife, and Gleason said, " let him alone, I can lick him, knife and all." The witness further testified, that the defendant, after the knife had been taken from him, said to William Hunter that " he would take that man's life for mere nothing; that revenge was sweet, and he had got it and was satisfied.

*Paul Kavanagh* and *William Hunter* gave substantially the same account of what occurred.

*John Wickes* testified that he was tending bar at the time; that Gleason came in and asked the defendant if he had said that he had stolen his box; that defendant said he did not accuse him of stealing the box; he might have lost it or left it in his overcoat pocket at home; that Gleason said he was no man at all, but a d—d bullhead, and if he thought he had it, he would go out and fight him; that defendant said he was a bigger man than he was, and wanted to know what he wanted to fight him for; that Hunter then jumped up and said, "No fighting, boys," and took Gleason out into the dancing room; that shortly after defendant followed; that they were out a few minutes, when Cushing called Gleason in to drink; they were just going to drink, when defendant came in; that he, the witness, was just cutting a lemon, and defendant said, " Jack, give me the knife; I want a slice of lemon."  That he drew the knife through his hand and came to Gleason and said, " You son of a bitch, I've got you now;" that he caught him by the coat collar and jabbed the knife into him; that defendant held the knife in his right hand, and as he was drawing it back to make another

stab the witness caught it; that Gleason then rushed him out into the other room.

Several witnesses were examined on behalf of the prosecution, but their testimony did not materially vary the case as above stated. It appeared from the testimony that the parties I ad been drinking freely that night, and that the affray occurred about two o'clock at night. Gleason died of the wound he received about eight days after. The presiding judge, in his charge to the jury, stated that the theory of the defence was, that the defendant, if guilty at all, was only guilty of manslaughter. That the theory of the prosecution was, that the defendant was guilty of premeditated murder, and after commenting upon the evidence relied upon by the prosecution to sustain their theory, he added: " Now, gentlemen, if you believe this evidence, and believe that the crime was committed by the defendant, under the circumstances as given to you by these witnesses, *I then see no ground to warrant you in finding the defendant guilty of manslaughter, but, in my judgment, he is then guilty of murder.*" To this part of the charge the counsel for the defendant excepted. The jury found the defendant guilty of murder. A bill of exceptions having been made and settled, the proceedings were removed into this court by a writ of error.

*R. W. Peckham,* for the people.

*J. Pierson,* for the defendant.

*By the Court,* HARRIS, J.—The question which the learned judge who presided at the trial was presenting to the jury at the time he used the language upon which the counsel for the defendant relies to sustain his allegation of error, was whether the defendant, if guilty at all, was guilty of murder or manslaughter. If, in submitting that question for the decision of the jury, he had taken occasion to express his own opinion, as to the effect of the evidence, leaving them to decide the question, notwithstanding such expression, it would not have fur-

The People v. Quin,

nished a valid ground of exception. Upon a motion for a new trial upon a case it might be otherwise, but such an expression of opinion does not of itself constitute error. It becomes important, therefore, to determine whether the language which is the subject of this exception amounted to an instruction as to the law applicable to the evidence in the case, or was a mere declaration of the opinion of the judge upon the evidence. On behalf of the defendant it had been insisted that the evidence warranted the jury in convicting him of manslaughter only, while, on the other hand, the counsel for the prosecution had insisted that the evidence required a conviction for murder. In respect to these opposing "theories," the learned judge. having very properly submitted it to the jury to determine whether the evidence as detailed by the witnesses for the prosecution was to be credited, proceeded to say that, if they should believe that evidence, he could see no ground left which would warrant them in finding the defendant guilty of manslaughter, but, on the other hand, the circumstances of the case, if believed, established a case of murder. It may not have been intended that the jury should understand that they had no right to convict the defendant of manslaughter. But I think the language may well be so construed. Indeed, I think it most likely that the jury understand from the charge that, if they would decide according to the law applicable to the case, they must either convict the defendant of murder or wholly acquit him. The language is emphatic and unqualified: " Under the circumstances as given you by the witnesses for the prosecution, I see no ground to warrant you in finding the defendant guilty of manslaughter." Upon such a charge, the jury may well have supposed that a verdict of manslaughter would have been in violation of law. If the charge was such that it might be so understood, I think it was erroneous. The evidence on the part of the prosecution was such as would, undoubtedly, have warranted a conviction for murder. The jury might well have come to the conclusion that the fatal blow was given with a premeditated design to effect death. On the other hand, I am not prepared to say .hat the jury might not have been war-

ranted in finding that the act was committed in the heat of passion. If so, the jury, instead of being told that there was no ground upon which they would be warranted in convicting of manslaughter, should have been instructed as to the distinction between murder and manslaughter, and left to convict the defendant of the one crime or the other, as they should find, from the evidence, that the act was committed with a premeditated design to effect the death of Gleason, or in the heat of passion.

Regarding that portion of the charge which has been inserted in the bill of exceptions rather as an instruction upon the law applicable to the facts proved, than an opinion advisory as to the effect of the evidence, I am inclined to think the charge had the effect, not intended perhaps, to mislead the jury, by inducing them to dismiss from their minds the consideration of the question whether their verdict should be murder or manslaughter. For this reason, I am of opinion that the judgment should be reversed and a new trial ordered.

Judgment reversed.